**SIGNED THIS: March 2, 2017**

_____
**Mary P. Gorman**
**United States Chief Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 15-90922 |
| ROSS J. FLECKENSTEIN and | ) | |
| KIMBERLY A. FLECKENSTEIN, | ) | |
| | ) | Chapter 7 |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| FORD MOTOR CREDIT | ) | |
| COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 16-09002 |
| | ) | |
| ROSS J. FLECKENSTEIN and | ) | |
| KIMBERLY A. FLECKENSTEIN, | ) | |
| | ) | |
| Defendants. | ) | |

## O P I N I O N

This matter is before the Court following a trial on the complaint of Ford Motor Credit Company, LLC ("Ford Credit"), to except from discharge the debt owed to it by Ross and Kimberly Fleckenstein. Because Ford Credit has not met its burden of proof as to several required elements, judgment will be entered against it and in favor of Ross and Kimberly Fleckenstein.

## I. Factual and Procedural Background

Ross and Kimberly Fleckenstein filed their voluntary Chapter 7 petition on August 31, 2015. Among the vehicles listed on their Schedule B - Personal Property were a 2014 Ford F150 valued at $30,000 and a 2015 Ford Fusion valued at $20,000. The Fleckensteins also disclosed that Ford Credit had a lien on both vehicles and they owed $60,840 on the F150 and $47,459 on the Fusion. Along with their petition and schedules, the Fleckensteins filed statements indicating their intent to surrender both vehicles to Ford Credit.

Ford Credit timely filed its Complaint to Determine Dischargeability of Debt ("Complaint") against the Fleckensteins. The Complaint alleged that the Fleckensteins were indebted to Ford Credit in the amount of $61,809.02, and that the debt should be excepted from their discharge because the Fleckensteins provided false financial statements to obtain the auto loans. Ford Credit alleged that Ross Fleckenstein's employment and income were materially misrepresented at the time of each purchase because he stated that he was employed by Fleckenstein's Bakery at a $10,000 monthly salary when, in fact, he had left that employment several months before the vehicles were purchased. The Fleckensteins answered the Complaint, admitting that Ross Fleckenstein's

-2-

employment and income were incorrectly reported on the credit applications used to obtain the auto loans but affirmatively asserting that, at the time of each purchase, Ross Fleckenstein was employed by Court Street Ford, the dealership from which the vehicles were purchased. The Fleckensteins alleged that the employees of Court Street Ford who prepared the financial documents submitted to Ford Credit had full knowledge of Ross Fleckenstein's employment at the dealership.

A bench trial was held on the Complaint during which Ford Credit presented the testimony of both Ross and Kimberly Fleckenstein, Andrew Maisonneuve and Brad Marcukaitis, both employees of Court Street Ford, and Ford Credit employee Clifford Thompson. Ford Credit also submitted as evidence the credit applications and installment sale contracts related to the purchases of the Ford Fusion and the Ford F150 from Court Street Ford in 2015, as well as a number of credit applications the Fleckensteins had used when purchasing vehicles from Court Street Ford with Ford Credit financing in the past. The installment sale contracts for all of the loans were executed by Court Street Ford as the original creditor and were subsequently assigned to Ford Credit.

According to his trial testimony, prior to filing bankruptcy, Ross Fleckenstein had spent about 28 years working at his family's business, Fleckenstein's Bakery. Mr. Fleckenstein resigned from his position on February 14, 2015, due to a breakdown in relations with his brother, who also worked at the bakery. At the time he left, he was earning approximately $10,000 per month. Mr. Fleckenstein testified that, after leaving the bakery, he took a job as a

- 3 -

salesman at a Chevrolet dealership. During the five weeks he worked there, he earned approximately $7000. He then left the Chevrolet dealership and took a sales position at Court Street Ford, where he believed his income would stay the same or increase. During the time he worked at Court Street Ford, however, Mr. Fleckenstein's income averaged only about $2300 per month.

About one week into his employment at Court Street Ford, in what he described as an effort to reduce expenses, Mr. Fleckenstein decided to trade in a 2013 Ford Mustang with a $900 monthly payment and a 2014 Ford Focus with a $412 monthly payment for a 2015 Ford Fusion with a payment of about $850 per month. Mr. Fleckenstein testified that he discussed the transaction with Brad Marcukaitis, the sales manager at Court Street Ford, who said that he would call Ford Credit to arrange the financing. Mr. Marcukaitis subsequently produced a credit application using information stored within Court Street Ford's computer system from prior transactions. Mr. Fleckenstein said that he signed the credit application but did not review it because he had signed many credit applications in the past at Court Street Ford. The application that he signed inaccurately described his current income and employment as $10,000 per month at Fleckenstein's Bakery. Mr. Fleckenstein testified that he never communicated directly with Ford Credit regarding the accuracy of the credit applications.

About a month later, Mr. Fleckenstein traded in a two-year-old Ford Edge for a new Ford F150. The monthly payment on the F150 was $1000—approximately the same as what was being paid on the Edge. For this transaction, Mr. Fleckenstein acted as his own salesman, but Mr. Marcukaitis

-4-

prepared the credit application and submitted it to Ford Credit. The credit application that was used for this purchase was identical to the one used in the purchase of the Ford Fusion a month earlier. Again, Mr. Fleckenstein did not review the credit application prior to signing it.

Mr. Fleckenstein admitted that the information on both credit applications regarding his employment, income, and education was inaccurate. He denied any intent to deceive Ford Credit, stating that he was relying on the employees of Court Street Ford to provide information to Ford Credit.

Kimberly Fleckenstein testified that she was employed at Things Remembered as a store manager earning about $3000 per month at the time of both vehicle purchases. She said that she was not present at Court Street Ford when her husband was negotiating the purchase of either of the two vehicles. In both cases, Mr. Fleckenstein asked her to come to the dealership after work to sign the credit applications and other paperwork associated with the vehicle purchases. Each time, she was presented with the documents for her signature by Andrew Maisonneuve, Court Street Ford's finance director, in the dealership's finance office. Mrs. Fleckenstein recalled only seeing the signature pages of the credit applications, not the applications themselves, and she said that she signed them without verifying that the information was accurate. She admitted that the information on the credit application regarding her husband's employment and income and the information regarding both of their levels of education was incorrect.

Bradley Marcukaitis testified that he was the sales manager at Court Street

Ford at the time the Fleckensteins purchased the Ford Fusion and Ford F150. He described the process used at Court Street Ford when individuals wish to purchase a vehicle on credit. Purchasers begin by filling out a credit application, which is given to either the sales manager or the finance director for processing. The credit application contains spaces for filling in information, including the borrower's name, address, time at residence, residence type, current and former employers, income, and education. The application is submitted electronically to the lender after which the lender rejects or authorizes the financing or requests further information. Once financing is approved, a retail installment contract is generated and is executed by the purchaser and finance director.

Mr. Marcukaitis also testified that he personally submitted the Fleckensteins' credit applications to Ford Credit for financing approval. When he did so, he reviewed the applications and was aware that they contained errors regarding Mr. Fleckenstein's income and employment. He did not suggest that any changes should be made to the applications, and he did not inform Ford Credit that the information on the credit applications was inaccurate. He did not recall whether Ford Credit automatically accepted the Fleckensteins' applications or whether more information was requested for either purchase. He said that in submitting the applications, he had no intent to deceive Ford Credit.

Andrew Maisonneuve testified that he has been the finance director at Court Street Ford for the past four years. He denied having anything to do with the preparation of the Fleckensteins' credit applications. He did testify, however, that, on behalf of Court Street Ford, he executed the installment sale contracts for the

purchase of the Ford Fusion and the Ford F150. He did not remember whether he was aware at the time of the two transactions that Mr. Fleckenstein was employed as a salesman at Court Street Ford.

Clifford Thompson testified that he is an employee of Ford Credit, and described the company's ordinary credit approval process. He explained that dealerships send information from credit applications electronically to Ford Credit, which enables Ford Credit to run a credit check. Many factors are considered when deciding whether to finance a vehicle purchase. Mr. Thompson described the borrower's credit history, ability to repay, and any prior relationship between Ford Credit and the borrower as being the most important factors. As to a borrower's ability to repay, Mr. Thompson explained that financing would typically be approved where the monthly payment is around 15% to 18% of a borrower's income. Other factors that are considered but given less weight are the stability of the borrower's employment and residence and the borrower's educational level. Some applications are "electronically approved" based on the factors described above, while others require additional analysis or investigation.

Mr. Thompson did not testify regarding the specifics of the approval process for the Fleckensteins' two credit applications and apparently had no knowledge of what had actually occurred with respect to either transaction. He was shown both credit applications and stated that the $13,000 in combined income shown on both would have been sufficient to obtain approval for both loans. He was then asked if the approximately $5500 of combined income shown on the Fleckensteins' bankruptcy schedules would have been sufficient to obtain the two

loans. He stated that such a drop in income would have drawn attention to the applications and resulted in some discussion about loan approval. He also suggested that the outcome of the loan applications probably would have been different if a combined monthly income of $5500 had been disclosed.

The parties offered legal arguments at the end of trial and the matter is now ready for decision.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). Determinations as to the dischargeability of particular debts are core proceedings. 28 U.S.C. §157(b)(2)(I). This matter arises from the Debtors' bankruptcy itself and from the provisions of the Bankruptcy Code, and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

## III. Analysis

Ford Credit brought its Complaint under §523(a)(2)(B), which provides for an exception from discharge for debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . (B) use of a statement in writing—(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that

the debtor caused to be made or published with intent to deceive[.]" 11 U.S.C. §523(a)(2)(B). To prevail, a creditor seeking to except its debt from discharge must establish each of these elements by a preponderance of the evidence. *Matter of Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995).

Ford Credit easily met its burden of proof with respect to several of the required elements of its cause of action. It is undisputed that the Fleckensteins owe Ford Credit a debt for money loaned to them. And there is no dispute that they used written statements concerning their financial condition to obtain the loans. *See Phillips v. Napier (In re Napier)*, 205 B.R. 900, 905 (Bankr. N.D. Ill. 1997) (stating that a credit application containing information about a debtor's employment and income is a statement concerning a debtor's financial condition). Likewise, there is no question that the written credit applications used in obtaining financing for the purchase of the Ford Fusion and Ford F150 contained inaccurate information. In both applications, Ross Fleckenstein's employment and income were misstated and information about the level of education of both of the Fleckensteins was incorrect. The disputed issues are whether the credit applications were reasonably relied on, whether the Fleckensteins acted with fraudulent intent, and whether the inaccurate information was materially false.

## A. Reasonable Reliance

To prevail, Ford Credit must establish both actual reliance on the false financial statements and the reasonableness of that reliance. *First Nat'l Bank of Lansing v. Kreps (In re Kreps)*, 700 F.2d 372, 376 (7th Cir. 1983). "Actual reliance

on a representation may be shown by evidence that the creditor would not have extended the credit if it had known the truth." *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 962 (Bankr. N.D. Ill. 1995). A creditor cannot establish that the lender actually relied on a misrepresentation if the lender knew at the time it extended credit that the representation was false. *Financial Pacific Leasing, LLC v. Kilaru (In re Kilaru)*, 552 B.R. 806, 813 (Bankr. N.D. Ill. 2016).

Whether a creditor's reliance is reasonable should be determined on a case by case basis. *Webster Bank, N.A. v. Contos (In re Contos)*, 417 B.R. 557, 566 (Bankr. N.D. Ill. 2009). The purpose of the analysis is not to subjectively evaluate a creditor's lending policies and practices, nor to second-guess the wisdom of a particular lending decision. *Id.* Further, creditors are not typically required to independently investigate the veracity of financial statements, but they may not ignore readily available facts in making lending decisions. *Id.*

Courts consider a variety of factors in determining whether a creditor's reliance was reasonable, including the creditor's standard practices in evaluating credit-worthiness, the standards or customs of the industry, and the surrounding circumstances existing at the time of the application for credit. *Colchester State Bank v. Phillips (In re Phillips)*, 367 B.R. 637, 645 (Bankr. C.D. Ill. 2007) (Perkins, J.). One factor that must be considered is whether a "red flag" appeared in a debtor's credit application that would have alerted an ordinarily prudent lender to possible inaccuracies and the need for further investigation. *Id.*

The analysis in this case is controlled by the precise details of the transaction. Court Street Ford, not Ford Credit, was the original entity to whom

-10-

the debts were owed. The installment contracts for the purchase of the Ford
Fusion and Ford F150 identify Court Street Ford as the creditor and show that the
contracts were subsequently assigned to Ford Credit. When a debt is assigned,
and the assignee seeks to except the debt from discharge, the assignee must
establish that the original creditor reasonably relied on the debtor's
misrepresentations. *See Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R.
496, 508-09 (Bankr. N.D. Ill. 2002) (analyzing whether the initial creditor, not its
assignee, satisfied the reliance element of §523(a)(2)(A)); *New Falls Corp. v.
Boyajian (In re Boyajian)*, 367 BR. 138, 147 (B.A.P. 9th Cir. 2007) (applying *Dobek*
to actions under §523(a)(2)(B)). Thus, the proof required was not that Ford Credit
reasonably relied on the Fleckensteins' false financial statements, but that Court
Street Ford did.

Ford Credit did not prove by a preponderance of the evidence that Court
Street Ford actually or reasonably relied on the Fleckensteins' false financial
statements in entering into either financing transaction. To the contrary, Court
Street Ford, through its employees, was actually aware that some of the
information in the credit applications was false. Brad Marcukaitis admitted that
he was aware that Ross Fleckenstein was a fellow employee of Court Street Ford
and not employed at Fleckenstein's Bakery; Mr. Fleckenstein was a salesman who
worked directly under the management of Mr. Marcukaitis.[1] Mr. Marcukaitis'

---

[1] Mr. Maisonneuve said that he did not recall knowing that Ross
Fleckenstein was a Court Street Ford employee when he was processing the
transactions. The Court found that testimony lacking in credibility and did not
believe it. He said that part of his job was working with salesmen at the dealership
to process financing applications for potential purchasers, and it is simply not

knowledge about Mr. Fleckenstein's employment and income was more than just a "red flag" of the sort that requires further inquiry; it constituted actual knowledge that the financial statements were false. Under ordinary agency and corporation law principles, Mr. Marcukaitis' knowledge is imputed to Court Street Ford. *See Campen v. Executive House Hotel, Inc.*, 105 Ill. App. 3d 576, 586, 434 N.E.2d 511, 517 (1982). Court Street Ford, the original lender, did not actually rely on the credit applications signed by the Fleckensteins and, accordingly, Ford Credit did not meet its burden of proof on the reliance element of its cause of action.

Additionally, even if Ford Credit's reliance was at issue, it did not provide evidence on how the credit applications were used in the decision to extend credit to the Fleckensteins. Mr. Marcukaitis testified that he submitted the credit applications to Ford Credit, but he did not remember whether Ford Credit immediately approved the applications, requested more information, or took some other action. Mr. Fleckenstein said that Mr. Marcukaitis told him that he was going to call Ford Credit to discuss the financing on the Fusion, but there was no evidence presented as to what Mr. Marcukaitis actually said, or if he communicated directly with anyone Ford Credit with respect to either transaction. And Mr. Thompson did not testify regarding the review of these particular credit applications—he only spoke as to what generally occurs in the review process.

---

possible that he did not know that Mr. Fleckenstein was one of those salesmen. Mr. Maisonneuve's demeanor while testifying evidenced a desire to distance himself from the Fleckenstein transactions and his lack of recall appeared to be motivated by that desire.

Thus, it is not clear whether or to what extent Ford Credit actually reviewed the credit applications and what weight was given to the particular information on the applications. Ford Credit's failure to establish what procedures were actually used in evaluating the Fleckensteins' credit applications precludes a finding of actual and reasonable reliance.

Someone at Ford Credit made the decision to finance both of the Fleckensteins' transactions at issue here and, presumably, someone at Ford Credit also communicated with Mr. Marcukaitis in some manner about the transactions. But Ford Credit failed to present any evidence whatsoever about the actual loan review process in this case and, accordingly, Ford Credit did not meet its burden of proof that it actually or reasonably relied on the inaccurate information contained in the Fleckensteins' credit applications. More importantly, Ford Credit failed to prove that the original creditor, Court Street Ford, actually relied on the inaccurate information. These failures are sufficient to require the entry of judgment in favor of the Fleckensteins.

### B. Fraudulent Intent

Ford Credit also failed to meet its burden to prove that the Fleckensteins acted with fraudulent intent. Intent to deceive can be established through direct evidence, although such evidence is rarely found. *Sheridan*, 57 F.3d at 633. As an alternative, a debtor's fraudulent intent "may logically be inferred from a false representation which the debtor knows or should know will induce another to make a loan." *Id.* (citations omitted). Intent to deceive may also be inferred if the

debtor exhibited a reckless indifference to the truthfulness of information contained in a written financial statement. *Contos*, 417 B.R. at 565. However, the decision of whether to infer intent from the circumstances of the transaction is left to the bankruptcy court's discretion. *Sheridan*, 57 F.3d at 633; *Chicago Patrolmen's Fed. Credit Union v. Fenner (In re Fenner)*, 558 B.R. 877, 888 (Bankr. N.D. Ill. 2016).

A number of factors weigh in the Fleckensteins' favor. They did not actually fill out the financial information on the credit applications that were submitted to Ford Credit for financing the Ford Fusion and Ford F150. Although they did complete credit applications by hand when first applying for financing through Ford Credit in 2009, it appears that all subsequent credit applications were generated using information stored within Court Street Ford's computer systems. It is not clear whether the forms the Fleckensteins signed for the transactions were generated before or after Mr. Marcukaitis called Ford Credit in either case, and there was no testimony that either Ross or Kimberly Fleckenstein provided any current information to Mr. Marcukaitis to update the applications. Most importantly, Ross Fleckenstein worked as a salesman at Court Street Ford and knew that Mr. Marcukaitis and Mr. Maisonneuve were aware of his current employment. He had no reason to think he could deceive either of them about his employment or income and there was no evidence he intended to do so.

Ford Credit suggested at trial that the Fleckensteins never intended to repay their debts to Ford Credit. The argument is based largely on the close timing between the vehicle purchases and the Fleckensteins' bankruptcy filing. The

Fleckensteins purchased the Ford Fusion on April 11, 2015, and then purchased the Ford F150 on May 15, 2015. They made two payments on the Fusion, on June 5 and July 15, and only one payment on the F150, on July 15. On August 31, 2015, the Fleckensteins filed their bankruptcy petition and surrendered both vehicles to Court Street Ford. It does raise suspicions when a debtor incurs debt close to a bankruptcy filing. But in this case, the timing is explained by Ross Fleckenstein's reasonable—albeit overly optimistic—expectation that he would be earning more money at Court Street Ford. That his reasonable expectations were not met is not a basis for excepting this debt from discharge. Moreover, in purchasing the Ford Fusion and Ford F150, the Fleckensteins merely rolled over the debt of the three vehicles that they traded in exchange for the Fusion and F150. They had consistently made their loan payments on those vehicles and, had they not traded them in to purchase the two new vehicles, presumably would have also surrendered them in their bankruptcy case.

This is not to excuse the Fleckensteins' lack of care in their dealings with Court Street Ford and Ford Credit. Mrs. Fleckenstein never reviewed the credit applications to ensure the information was correct. She testified that she received only the signature pages of the credit applications, which did not contain any financial information, and signed them without asking for the applications themselves. Mr. Fleckenstein did receive the credit applications but did not review them or correct the errors. The Fleckensteins were wrong in not reading all of the documents they signed. But there was no evidence presented that they were intentionally deceitful.

Ford Credit noted that the previously submitted credit applications contained different information from year to year and suggested that this was the result of the Fleckensteins supplying new information at each of their prior transactions. But, given the number of discrepancies in the documents and the way Court Street Ford prepares credit applications for repeat customers, it is just as likely that a Court Street Ford employee updated the information on the credit applications for each new vehicle purchase based on information within their computer system and taking into account passage of time. No evidence was presented that the Fleckensteins had ever updated their original application themselves or that the changes in the documents from purchase to purchase were specifically made by them.

The Fleckensteins were careless and imprudent in making their loan applications with Court Street Ford for the purchase of the Fusion and the F150. But neither of them had any reason to think that the Court Street Ford employees, with whom they were dealing and who were preparing the paperwork for the transactions, were confused about where Ross Fleckenstein worked or how he was being compensated for his work. Mr. Marcukaitis and Mr. Maisonneuve knew the credit applications were inaccurate and, accordingly, the Fleckensteins did not have an intent to deceive when they signed them. Ford Credit has not proven otherwise.

### C. Materially False Financial Statement

The remaining disputed element is whether the Fleckensteins' credit

applications were materially false. There is no doubt that the credit applications, which stated that Ross Fleckenstein was still earning $10,000 per month at Fleckenstein's Bakery, contained false information. The applications also inaccurately stated that the Fleckensteins were both graduates of four-year colleges.

The Seventh Circuit has not given clear guidance regarding the materiality element of §523(a)(2)(B). One test that is frequently used is the "but for" test, under which "a misrepresentation is material only if the creditor would not have advanced funds but for the debtor's misrepresentation." *Selfreliance Fed. Credit Union v. Harasymiw (Matter of Harasymiw)*, 895 F.2d 1170, 1172 (7th Cir. 1990). The Seventh Circuit has described the "but for" test as a "recurring guidepost" in the analysis but has not decided whether a creditor must prove but-for causation to establish an exception to discharge under §523(a)(2)(B). *Id.* (quoting *Matter of Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985)). An alternative, less stringent test treats any "important or substantial untruth" as materially false. *Id.* A false statement that satisfies this test is one that "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *Bryson*, 187 B.R. at 962 (quoting *Jordan v. Southeast Nat'l Bank (In re Jordan)*, 927 F.2d 221, 224 (5th Cir.1991)).

Courts in the Seventh Circuit are split as to the appropriate test to apply. *See, e.g.*, *Phillips*, 367 B.R. at 644 (stating that a creditor can prevail by satisfying either test); *Westbank v. Grossman (In re Grossman)*, 174 B.R. 972, 984 (Bankr.

N.D. Ill. 1994) (presuming the "but for" test to be the appropriate test); *Community Bank of Homewood-Flossmoor v. Bailey (In re Bailey)*, 145 B.R. 919, 930 (Bankr. N.D. Ill. 1992) (applying the "substantial untruth" test). Ford Credit did not sustain its burden under either test.

Ford Credit did not meet its burden to prove that the outcome of its loan reviews would have been any different if the Fleckensteins had updated their credit applications with accurate information. According to Mr. Thompson, the most important factors Ford Credit uses in making lending decisions are credit history, prior relationships with borrowers, and car payment amount relative to income. The Fleckensteins had previously purchased at least six vehicles from Court Street Ford using financing obtained from Ford Credit, making all monthly payments as they came due. Because the Fleckensteins had been paying their debts on time, a credit report would likely have reflected a low default risk. Further, Mr. Thompson's testimony regarding the analysis of a borrower's income was general in nature. He stated that the basic guideline is that a monthly car payment should not exceed 15% to 18% of a borrower's income, but he acknowledged that income is only one of the factors considered. He did not specify whether gross or net income is used for loan reviews or whether the analysis is different if a borrower is purchasing a replacement vehicle or an additional vehicle.

At the time the Fleckensteins purchased the Ford Fusion, it was only about one week after Mr. Fleckenstein had started working at Court Street Ford—before he was able to establish an income history there. His income at the previous

dealership had been around $7000 over five weeks—about $6000 per month—and he expected his income to stay steady or increase while at Court Street Ford. Had he reported his prior income at the other dealership and specified that he did not yet know his income at Court Street, the credit applications would have reflected a combined monthly income of approximately $9000. The $850 monthly payment on the Ford Fusion is less than 10% of $9000, and based on the general guidelines Mr. Thompson explained, the financing might well have been approved.

By the time the Fleckensteins purchased the Ford F150, Ross Fleckenstein had been working at Court Street Ford for a month, but Ford Credit did not present any evidence of what his income actually had been for that month. Even if the Fleckensteins' combined monthly income at the time was the $5500 later shown on their bankruptcy schedules, the monthly payment of about $1000 on the Ford F150 would have been less than 19% of that combined income. That amount is close to the range that Mr. Thompson specified in his testimony. Given the other factors Mr. Thompson said Ford Credit considers, Ross Fleckenstein's decrease in income might well have triggered some additional scrutiny but not necessarily a denial of the loan application.[2] Because Mr. Thompson testified so generally about how Ford Credit makes lending decisions, this Court cannot find

---

[2] The Fleckensteins argued that the purchase of the Fusion was beneficial to Ford Credit because the value of the two vehicles traded in for the Fusion exceeded the value of the Fusion and therefore the net amount of debt owed to Ford Credit was reduced by the transaction. The Fleckensteins' monthly payments were reduced significantly by the first transaction and stayed the same after the second transaction. Based on Mr. Thompson's testimony, the Fleckensteins' ability to make payments would have been considered in any loan review and might well have been a positive factor in making a loan decision, even though the Fleckensteins' income had been reduced.

that the results of either application would have been different had the Fleckensteins submitted more accurate credit applications.[3]

Ford Credit also argued that the statements regarding the Fleckensteins' education on the credit applications were materially false. Both Ross and Kimberly Fleckenstein are listed on the credit applications as holding four-year college degrees. In fact, Mrs. Fleckenstein has only a two-year degree and Mr. Fleckenstein completed a confectionary arts program at a technical college. These misstatements, however, are at best tangentially related to the Fleckensteins' financial condition. Further, Mr. Thompson made clear that a borrower's education is only minimally weighted in a financing decision, particularly when there is a prior relationship between Ford Credit and the borrower. The misstatements about the Fleckensteins' education made in the credit applications were not materially false statements respecting their financial condition.

## IV. Conclusion

Although Ford Credit has established that the Fleckensteins signed false financial statements when purchasing two new vehicles that it ultimately financed through assignment from Court Street Ford, it has not established the material falsity of the statements, that the statements were reasonably relied on, or that

---

[3] The Court is not finding that the difference between $10,000 per month and $2300 per month in income is insignificant. Common sense says otherwise. But Ford Credit failed to provide evidence on how such a difference would have impacted the transactions involved here. Mr. Thompson saw the Fleckensteins' credit applications for apparently the first time when he was on the witness stand and he had no knowledge about any of the other factors that might have impacted a credit decision regarding the transactions at issue here.

the Fleckensteins acted with fraudulent intent. Judgment will therefore be entered for the Fleckensteins.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###